## J. M. CEBALLOS & COMPANY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 108. Argued March 10, 1909.—Decided May 17, 1909.

Where a contract requires construction as to the mode of its performance, a similar contract in writing between the same parties which had been fully performed prior to the execution of the contract to be construed, serves, within proper limitations, to throw light upon the construction of the later contract and may be referred to for that purpose.

A contract having been made by the United States with Ceballos & Co. for the repatriation of the Spanish prisoners in Cuba after the Spanish war, similar in terms to another contract subsequently made with the same parties for the repatriation of the Spanish prisoners

in Manila, providing certain accommodations for officers and steerage accommodations for men and other persons designated by the Secretary of War, the fact that in the performance of the Cuban contract the wives and children of the officers were given similar cabin accommodations to those of their respective husbands and fathers, and the United States had paid therefor the higher rate, *held* to be material in construing the Philippine contract and also *held* that Ceballos & Co. were entitled to payment for the transportation of the wives and children of officers at cabin rates.

The same contract construed as entitling Ceballos & Co. to half rates of cabin transportation for children under ten, and steerage rates for the "other persons designated by the Secretary of War," that expression not embracing wives and children of officers, but embracing all designated persons other than officers and their wives and children. A contract carrying out treaty obligations should be liberally construed so as to effectuate the purposes intended by the treaty.

In the light of all the surrounding circumstances it will not be assumed that the United States in carrying out its stipulations for the capitulation of Manila would commit an act of inhumanity such as separating the surrendered officers from their wives and children by furnishing the former with cabin, and the latter with steerage, accommodations on the voyage to Spain under the repatriation provision of the treaty of peace.

42 C. Cl. 318, reversed.

THE facts, which involve the construction of the contract between Ceballos & Co. and the United States for the repatriation of the prisoners of war and other persons from the Philippine Islands to Spain, are stated in the opinion.

*Mr. William V. Rowe* and *Mr. John J. Hemphill* for appellants.

*Mr. Assistant Attorney General John Q. Thompson*, with whom *Mr. Franklin W. Collins* was on the brief, for the United States.

MR. JUSTICE WHITE delivered the opinion of the court.

Speaking in a general sense, this case involves determining how much, if anything, is due by the United States to J. M.

Ceballos & Co., the appellants, for services rendered in pursuance of oral and written contracts for the repatriation of certain persons from the Philippine Islands to Spain. Before coming to the case as made by the record it is necessary to dispose of a preliminary consideration which may throw light upon one of the questions arising for decision.

Ceballos & Co.—who here assert their rights as arising from contracts made, as we have said, concerning transportation of persons from the Philippine Islands to Spain—after the surrender of the Spanish forces at Santiago, made a contract with the United States for the repatriation from Cuba to Spain of the prisoners of war resulting from that surrender. That contract was performed, and it is conceded that all obligations of the United States under the same were discharged. It is admitted, however, that at the trial below the Cuban contract, as it is termed, was offered and the mode of execution thereof was established by competent evidence, upon the assumption that such facts were proper to be taken into view in the elucidation of the particular contracts which are here involved. No finding was made by the lower court on the subject, although one was requested. After the filing of the record in this court a motion was made praying that the lower court be directed to find whether or not the Cuban contract had been made as stated, and whether or not the wives and children of Spanish officers transported thereunder were also transported under the contract, and, if they were, the rate paid for such transportation. The motion was resisted, and action thereon was postponed until the hearing on the merits. In the discussion at bar it was conceded by the Government that the Cuban contract had been offered in evidence below, that the contract was correctly printed in one of the briefs, and that it had been performed in a particular manner. It was, however, insisted that the Philippine contracts here involved were unambiguous, and therefore the Cuban contract was irrelevant. It was conceded, if it was deemed that there was such ambiguity in the Philippine contracts as to require construction, and that

the construction might be elucidated by the Cuban contract and the mode·of its performance, that contract and the admission as to the manner in which it had been performed might be treated as part of the record for the purposes of the case before us without the necessity of directing findings on the subject. As we are clearly of opinion that the contracts which are here involved require construction, and that the previous contract between the parties as to the movement of the prisoners of war from Cuba to Spain, and the construction which obtained in the execution thereof, may serve within proper limitations to throw light upon the construction of the contracts here involved we treat the Cuban contract and its mode of performance as embraced in the record, and review the case in the light thereof.

In the month of July, 1898, and from that time until the commencement of this litigation, the members of the appellant firm were the American operators and agents of the Compañía Transatlántica, a steamship line engaged in the transportation of freight and passengers between the ports of Spain and the Philippine Islands. As such agents Ceballos & Co. executed a contract with the United States, a copy of which is in the margin [1] to safely transport from Cuba to Spain the

---

[1] Cuban Contract.

Sealed·proposals having been invited for the transportation of the Spanish prisoners of war who surrendered to the United States forces in Cuba, from Santiago de Cuba to Cadiz, or such port of same as might thereafter be designated, and the proposal submitted by J. M. Ceballos & Company of New York, having been duly accepted:

It is hereby, on this twenty-first day of July, 1898, agreed, by and between the Secretary of War of the United States and said J. M. Ceballos & Company, that said company shall transport well and safely all of the troops of Spain that were surrendered by General Toral to the Army of the United States in Cuba, in the capitulation entered into by him at Santiago de Cuba, from said Santiago de Cuba to such port in Spain as the Secretary of War of the United States may designate, and that the Government of the United States will pay for such transportation, and for the subsistence and delivery on shore of the prisoners, the sum

troops of Spain surrendered at Santiago de Cuba. Under this contract the wives and children of Spanish officers were carried in the cabins, and without question, the first-class rate was paid for the transportation.

The city of Manila surrendered the thirteenth of August,

of twenty dollars ($20) for each enlisted man or private soldier, and the sum of fifty-five dollars ($55) for each officer so delivered.

The said company further stipulates that said subsistence furnished by the company shall be equal to United States Army garrison rations; that cabin accommodations are to be supplied for the said officers, and third-class or steerage accommodations, having suitable galley accommodations with ample space and ventilation for the enlisted men or privates; that for the purpose aforesaid it will have at Santiago de Cuba within seventeen (17) calendar days from this day (that is to say, on or before the seventh day of the month now next following) seven (7) steam vessels with a total capacity for the conveyance of at least ten thousand (10,000) prisoners in conformity with the foregoing stipulations, and ready to take them on board and proceed immediately to Spain; and the remaining vessels, in number and capacity as the Secretary of War may notify the company, within twenty-one (21) days from the date of such notice.

The Secretary of War stipulates that the United States will give safe conduct as against the Army and Navy of the United States to the vessels of the company engaged in the business aforesaid while proceeding to Santiago and from there to Spain, such safe conduct not to apply to ships already seized or in blockaded ports, and the ships employed as aforesaid to have only such armament as is customarily carried by merchant ships. Such safe conduct is to extend to foreign, West Indian, Cuban and Spanish ports, and to remain in effect until the prisoners are unloaded in a Spanish port designated, and is expressly made applicable to steamers of the Spanish Transatlantic Line, under the Spanish flag.

For the better security of such safe conduct a document in the following form and duly signed will be furnished to the company for each ship, which shall be exhibited on demand, together with a copy of this contract, to any officer of the Army or Navy of the United States visiting the vessel:

"The President of the United States to all whom it may concern, greeting: This is to certify that the —————————— is employed under contract with the Government of the United States in the business of

1898, and August 14 the United States and Spanish authorities agreed upon written terms of capitulation, of which article 5 is as follows:

"All questions relating to the repatriation of officers and men of the Spanish forces and of their families and of the expenses which said repatriation may occasion, shall be referred to the Government of the United States at Washington."

The following statement as to the situation at Manila and the making of an oral contract and subsequently of a written contract are taken from findings made below.

There was surrendered to the United States forces at Manila on August 13, 1898, a large number of civil, naval, and military officers and their families, and a much larger number of enlisted men, together with the wives and children of some of these enlisted men. Many of these were in a pitiable condition physically, exhausted with exposure and disease—1,200 being sick at one time—all of them fed, guarded and attended at

transporting from Santiago de Cuba to a port in Spain Spanish prisoners heretofore surrendered to the Army of the United States in Cuba; that the Government of the United States has guaranteed safe conduct for this purpose to the ——— ——— in going to and from Santiago de Cuba and until the disembarking of said prisoners in a Spanish port.

"All persons under the jurisdiction of the United States are required to respect such guarantee.

——— ———."

The company further stipulates that it will furnish the bond of ——— ——— for the proper and faithful performance of this contract.

The Secretary of War agrees that the United States will deliver the prisoners aforesaid on board at Santiago within a reasonable time after the vessels are ready, and to the number of at least ten thousand men (10,000) men, five hundred (500) officers, and that the payment of the said twenty ($20.00) dollars and fifty-five ($55.00) dollars for each man and officer to the numbers last aforesaid shall be made when satisfactory evidence that the prisoners have been transported and delivered in accordance with this contract is presented to him.

Witness our hands and seals this twenty-first day of July, 1898.

R. A. ALGER, *Secy. of War*.
J. M. CEBALLOS & Co.

the expense of the United States.  Smallpox had been prevalent and infection was apprehended.  The civil prisoners included Spanish civil officers on duty in the Philippine Islands under the government of Spain.  Many of these had wives and children with them.  There were besides a number of civilians, such as nurses, nuns, monks, friars, sisters of charity and lady pensioners.  The United States treated all of these classes as prisoners of war, and had supreme control of them after the surrender of Manila until they were delivered aboard plaintiff's ships for transportation, at which time the supervision of the United States ceased.  Spanish officers had in the meantime only such supervision over their troops as the United States permitted.

General Otis, commanding the United States forces in Manila, considered that an emergency existed requiring immediate action, and on October 7 and October 24, 1898, cabled the War Department at Washington the request of the Spanish general at Manila for permission to allow sick Spanish officers and soldiers to depart for Spain.  Permission being granted, these officers and soldiers were shipped on vessels of the Compañía Transatlántica by the Spanish authorities in Manila, acting under the supervision and control of the United States authorities, but under an oral agreement with Ceballos & Co., as hereinafter stated.

In the emergency deemed existing by the commanding general, and communicated to the War Department, the Secretary of War, in October or November, 1898, entered into an oral agreement with Ceballos & Co., by which the latter agreed to transport such of the Philippine prisoners as the United States desired to return to Spain, the price to be paid for such transportation to be the price fixed after the United States should advertise for bids for such transportation, under contract expected thereafter to be entered into under the terms of a treaty of peace between the United States and Spain.

Under this oral agreement, Ceballos & Co. immediately began furnishing vessels, and the transportation of the Phil-

ippine prisoners commenced by a vessel which sailed from Manila, November 7, 1898, and continued until another and a written contract was entered into for the transportation of those prisoners not transported under the oral agreement.

The shipments under the oral contract were five in number, and the wives and children of officers were carried in the cabin, as under the Cuban contract.

On December 10, 1898, by the treaty of peace it was stipulated in paragraph 1, article 5, that—

"The United States, will, upon the signature of the present treaty, send back to Spain, at its own cost, the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces."

And in article 6, that—

"Spain will, upon the signature of the present treaty, release all prisoners of war, and all persons detained or imprisoned for political offenses, in connection with the insurrection in Cuba and the Philippines and the war with the United States.

"Reciprocally, the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain the release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.

"The Government of the United States will, at its own cost, return to Spain, and the Government of Spain will, at its own cost, return to the United States, Cuba, Porto Rico, and the Philippines, according to the situation of their respective homes, prisoners released or caused to be released by them, respectively under this article."

On January 20, 1899, the Quartermaster General, U. S. Army, by direction of the Secretary of War, invited sealed proposals "for the transportation of the Spanish prisoners of war now in the Philippine Islands . . . to Cadiz or such other ports of Spain as may hereafter be designated." Among other things it was stated in the advertisement as follows:

"Their number is estimated as about 16,000 officers and

enlisted men. · Cabin accommodations are to be supplied for the officers and third-class or steerage accommodations, having suitable galley accommodations, conforming to the United States requirements as to space and ventilation, for the enlisted men.

\*    \*    \*    \*    \*    \*    \*    \*

"Proposals will state the price per capita for transporting officers and for transporting enlisted men and for their subsistence and delivering them on shore at the Spanish port, or ports to be designated, and will be accompanied by a guarantee that the prisoners will be comfortably cared for and subsisted while on the journey.

. \*    \*    \*    \*    \*    \*    \*    \*

. "Payment for the service will be made when evidence is furnished that the ship has arrived with her passengers at point of destination. The number of officers and men counted aboard at place of embarkation by the quartermaster is to determine the number to be paid for. . .. ." ·

The following bid was submitted:

"Sir: In accordance with the advertisement of Gen. M. I. Luddington, quartermaster general, U. S. Army, copy of which is hereto attached, I propose, on behalf of Messrs. J. M. Ceballos & Co., agents of the Compañía Transatlántica, de Barcelona, to furnish transportation for the Spanish prisoners now in the Philippine Islands to any port or ports in Spain. Their number estimated at 16,000 officers and enlisted men. I propose to use in this service the steamers named in the annexed list, which fully sets forth the classification of each, · the tonnage capacity of each, their speed, the berth accommodations upon each, and the approximate length of time required by each vessel to make the voyage to Spain. (The length of time is estimated from Manila.) Said list gives the time at which each vessel will arrive in or off the harbor of Manila for orders, the act of God and all dangers of the sea excepted.

"It is proposed not to load the steamers beyond two-thirds

of their steerage capacity. This. is considered not only advisable as an act of humanity, but absolutely necessary, owing to climatic conditions and length of voyage. :

"I further propose to call at any port of the Philippine Islands that the U. S. Government may designate, provided the vessels can safely lay afloat.

: "The charge for this service is dependent on the ports of call in the Philippines, and also on the quarantine regulations in. Spain, but I propose and hereby agree to do this service at a price not to exceed in any case: ·

For each officer.............................$215 00
For each enlisted man........................ 73 75

₂ "It is proposed to furnish subsistence equal to the United States garrison rations, or, if preferred, the usual rations furnished under Spanish regulations.

"I will furnish a satisfactory bond for the faithful fulfillment of this service."

This bid was accepted, and on March 4, 1899, a contract was executed between the Secretary of War and Ceballos & Co., by their attorney in fact, which, omitting the attestation clause and signatures, is as follows:

"Whereas, under the terms of the treaty of peace entered into by and between the representatives of the Governments of the United States and of Spain, signed at Paris on December 10, 1898, it is mutually agreed and stipulated in the first paragraph of Article V that—

"'The United States will, upon the signature of the present treaty, send back to Spain, at its own cost, the Spanish soldiers taken as prisoners of war on the capture of Manila by the American forces.'

"'And in Article VI, which reads as follows:

·"'Spain will, upon the signature of the present treaty, release all prisoners of war, and all persons detained or imprisoned for political offenses, in connection with the insurrection in Cuba and the Philippines and the war with the United States.

"'Reciprocally, the United States will release all persons made prisoners of war by the American forces, and will undertake to obtain release of all Spanish prisoners in the hands of the insurgents in Cuba and the Philippines.

"'The Government of the United States will, at its own cost, return to Spain, and the Government of Spain will, at its own cost, return to, the United States, Cuba, Porto Rico and the Philippines, according to the situation of their respective homes, prisoners released or caused to be released by them, respectively, under this article.'

"And whereas sealed proposals having been invited for the transportation of the Spanish prisoners from Manila or such other port in the Philippine Islands as may be designated to Cadiz or such other port in Spain as may be designated, and in response thereto the proposal of J. M. Ceballos & Company, of New York, having been duly accepted by the Secretary of War of the United States:

"Therefore this article of agreement is made and entered into this 4th day of March, 1899, by and between the said J. M. Ceballos & Company for the transportation of the said prisoners of war, from the Philippine Islands to Spain, as are designated in the terms of the treaty of peace, referred to and quoted herein.

"The said J. M. Ceballos & Company hereby agree to furnish good and safe transportation for such number of prisoners of war and persons as may be designated by the Secretary of War, from the Philippine Islands to such port in Spain as may be designated by the Secretary of War, and to furnish to them subsistence while en route and on board the ships, and to deliver them on shore in Spain.

"The said company further agrees that for the purpose herein stipulated they will provide a sufficient number of steamships for the safe and comfortable transportation of the prisoners of war and such other persons as may be designated by the Secretary of War, with cabin accommodations for all officers, and third-class or steerage accommodations, space

and ventilation for the enlisted men and other persons on board each ship; that the subsistence furnished by the company shall be equal in every respect to the United States army garrison rations.

"The company further agrees to provide a sufficient number of steamships in the harbor of Manila to perform the entire service as herein stipulated, so that the embarkation of the last of the prisoners of war and the other persons may be made not later than May 1st, 1899; that the ships to be used for the purpose are named and described in the list submitted with their proposals, copy of which is hereto attached as a part of this agreement, and the company agrees that no troops shall be transported upon any one of said ships in excess of two-thirds of the steerage capacity of each ship as shown in the list referred to.

"In consideration of the faithful performances of the foregoing stipulations and in compensation therefor, the Secretary of War hereby agrees on behalf of the United States to pay to the said J. M. Ceballos & Company, for the transportation, subsistence, and delivery on shore of each commissioned officer, the sum of two hundred and fifteen dollars ($215.00), and for each enlisted man, private soldier, or other person designated by the Secretary of War for transportation the sum of seventy-three dollars and seventy-five cents ($73.75), the said sums to be due and payable upon evidence that said officers, enlisted men, or persons have been transported, subsisted, and delivered on shore in Spain.

"It is further agreed that the prisoners of war and all other persons to be transported shall be delivered by the United States on board the ships at such ports in the Philippine Islands as may be designated by the Secretary of War, within five (5) working days after the vessel or vessels are ready to receive them. Demurrage, if any, earned by any such steamer or steamers to be paid by the United States at the rate fifteen cents (15c.) per gross ton register per day, and for any prisoners on board at the rate of $1.50 for each officer per day and

forty cents for each enlisted man per day. An account of the number of officers, enlisted men, or other persons to be taken at the time of embarkation by a representative of the Government of the United States and a representative of the said J. M. Ceballos & Company, and payment to the said company shall be made upon the basis of the number of officers, enlisted men, and persons counted on each ship.

"It is further agreed that all steamers shall call at the port of Manila for orders, and should the Secretary of War elect to deliver prisoners to any steamer or steamers at any other port in the Philippine Islands, orders to that effect must be given within twenty-four hours after the steamer or steamers have reported to the commanding officer at the port of Manila.

"No member or delegate to Congress, nor any person belonging to, or employed in, the military service of the United States, is or shall be admitted to any share or part of this contract, or to any benefit which may arise therefrom."

The findings show that the vessels which were supplied to perform this contract, like those which were supplied to perform the Cuban contract and the subsequent Philippine oral contract, were furnished with cabin and steerage accommodations, and that the officers, civil and military, with their respective families, were carried in the cabin, and in the steerage were carried the enlisted men and their families and other persons entitled to third-class passage.

For the first twenty-five shipments payment was made by the United States upon certificates of the masters of the respective ships on which said prisoners of war and other persons were transported, certified to be correct at the place of landing, showing the different classes of passengers.

The court below also found as follows:

The obligation of this country to repatriate any other persons or classes of persons than those who were actually prisoners of war or political prisoners was questioned by the Secretary of War.

On December 18, 1899, the Secretary of War addressed an

official letter to the Attorney General, stating that under the terms of the treaty of peace the obligation of the United States to send to Spain at its own cost the wives and children of officers and soldiers and civil prisoners designated as officials and their wives and children was not clearly defined, and that the rates of compensation for the transportation of such persons were not set forth in the contract. But in that connection the Secretary requested an opinion as to the construction of the treaty of peace in regard to the scope of the description of Spanish prisoners, whether and to what extent the treaty included the repatriation of non-combatants at the cost of the United States. The Secretary further requested a construction of the contract rate of compensation which might be allowed and paid per captia for each class of persons charged for under the terms of the contract with Ceballos & Co. On January 6, 1900, the Attorney General answered this official communication of the Secretary of War and construed the contract substantially as follows: That it was questionable whether all the persons tendered and transported were not within the purview of the treaty, but that this was a question for the United States authorities and not for the carrier, who would have been guilty or might have been guilty of a breach of his contract in refusing to carry persons designated to be carried by the United States. The Attorney General further informed the Secretary of War that the contract related to the transportation of prisoners; that as between the contracting parties it rested alone with the United States to say whom it would send back to Spain, and in doing so to alone determine who were prisoners and who came within the purview of the treaty or the contract. That the words "other persons" were included within "enlisted men," and that as to all enlisted men and all persons other than officers, military and civil, $73.75, and no more, was payable by the United States under the contract.

On January 19, 1900, the Secretary of War notified one of the firm of Ceballos & Co. that he had, on January 17, cabled

General Otis at Manila that civil officials; prisoners' wives and children were entitled to passage to Spain; and that the contract provided for shipment of civil officials as officers on the basis of $215 per capita; that wives and children of officers, soldiers and civil officials were entitled to transportation to Spain on the basis of $73.75 per capita.

As shown on statement, copied in the margin,[1] the United States paid to Ceballos & Co., under the Philippine oral and written contracts, the sum of $1,544,595. It will be seen that no payments were made in respect of the transportation of other persons than officers and enlisted men until after the Attorney General had rendered the opinion above referred to. Of the various classes of persons specified, all but "officers"

---

[1] Payments.

Sundry Checks Received by J. M. Ceballos & Co.—Payments on % by United States Government.

| | Officers. | Enlisted men. | Women and major children. | Minor children. | Civil officials. | Warrants. |
|---|---|---|---|---|---|---|
| June 20–99... | 1019 | 7067 | ...... | ...... | ...... | $666,247.62 ($74,028.62, 10% retained by Government.) |
| Nov. 28–99... | 131 | 1198 | ...... | ...... | ...... | 190,545.12 (inclu. previous 10% as above.) |
| July 30–1900.. | 288 | 3728 | 1302 | 406 | ...... | 447,853.75 |
| Oct. 6–1900.. | 148 | 1425 | 53 | ...... | ...... | 140,822.50 |
| Apr. 11–1902.. | ...... | ...... | ...... | ...... | 393 | 28,983.75 |
| Apr. 21–1902.. | ...... | ...... | ...... | ...... | ...... | 9,746.25 (315 Civ.) |
| July 3–1902.. | ...... | ...... | ...... | ...... | ...... | 34,747.50 (Off. @ $141.25, diff. bet. 1st and 3d class.) |
| Oct. 31–1902.. { | ...... | 16 | ...... | ...... | ...... | 1,180.00 |
| | ...... | 19 | ...... | ...... | ...... | 1,401.25 |
| | ...... | 6 | ...... | ...... | ...... | 442.50 |
| Nov. 3–1902. { | 1 | 4 | ...... | ...... | ...... | 510.00 |
| | 1 | ...... | ...... | ...... | ...... | 215.00 |
| | ...... | 10 | ...... | ...... | ...... | 737.50 |
| | ...... | 1 | ...... | ...... | ...... | 73.75 |
| Nov. 3, rec'd and ret'd... | 8 | 17 | 6 | ...... | ...... | 3,416.25 |
| Feb. 26–1903, deposited... | 1 | 1 | 2 | ...... | ...... | 436.25 |
| | 5 | 91 | ...... | ...... | ...... | 7,786.25 |
| | 9 | ...... | ...... | ...... | ...... | 1,935.00 |
| M'ch 7–1903.. { | ...... | ...... | 12 | ...... | 18 | 4,755.00 |
| Sup. Bill No. | ...... | ...... | 8 | ...... | 2 | 1,020.00 |
| 22. ...... | ...... | ...... | 9 | ...... | 3 | 1,308.75 |
| | ...... | ...... | 1 | ...... | ...... | 73.75 |
| | 2 | less not | 1 all'd | ...... | ...... | 356.25 |
| Totals... | 1613 | 13583 | 1392 | 406 | 416 | $1,544,595.00 |

were paid for at steerage or third-class rates, and this regardless of whether cabin or steerage accommodations were furnished. Minor children, that is, those under the age of ten years, were paid for at half the adult rate.

On August 15, 1908, Ceballos & Co. commenced this action in the Court of Claims to recover a balance alleged to be due under the Philippine contracts for the carriage of 3,445 cabin passengers at $215 each; 415 minor children, carried in cabin at half rate, $107.50; 13,647 steerage passengers at $73.75 each, and 20 minor children carried in steerage at half steerage rate, $36.75 each. For this service it was averred $1,792,491.25 had been earned, and after deducting payments of $1,544,595 there was still due Ceballos & Co. $247,896.25. Subsequently an amended petition was filed, in which full adult cabin and steerage rates were demanded for minor children, increasing the alleged indebtedness of the United States to the sum of $293,246.25.

A counterclaim, contained in three numbered paragraphs, was filed on behalf of the United States. In paragraph first it was in substance averred that the United States was entitled to recover back from the claimants the sum of $371,988.75, paid for the transportation of persons under the alleged oral contract in November and December, 1898, and January, 1899, because the same was paid without authority of law prior to the execution of any contract, expressed or implied, between the United States and Ceballos & Co., or any one in its behalf. In paragraph second an indebtedness from Ceballos & Co. of $12,788.75 was alleged, because of moneys paid to the firm for the transportation of persons who were not actually landed in Spain as required by the contract. In paragraph third it was averred that as to two shipments made on November 25, 1899, and December 18, 1899, the claimants by means of a supplemental bill had collected a second time transportation charges for fourteen military officers (at the rate of $215 each) and 91 enlisted men (at the rate of $73.75 each), whereby $9,721.25 had been overpaid by the United States to Ceballos & Co.

There was contention then in the court below in regard to the number of persons carried from the Philippines to Spain and as to the compensation to be paid. For the Government it was urged that, deducting the overcharge covered by the third counterclaim for the transportation of 105 persons, payment in full had been made for all persons legally shown to have been transported, viz., 17,305 persons. On the other hand, the appellants contended that 17,527 persons had been carried, a difference of 222 persons. As to such excess the Government alleged it had refused payment as to 198 persons, because it had not been shown by the evidence stipulated for in the contract that such persons had embarked and been carried to Spain, and that it had refused payment as to the remaining 24, because twice counted.

The dispute as to compensation arose from the contention by Ceballos & Co. that it had carried the wives and children of Spanish military officers and civil officials in the cabin and the cabin rate was properly chargeable, while the Government insisted that the steerage rate applied and had been paid. Ceballos & Co. also contended that for the carriage of other non-combatants, who were entitled to be considered prisoners of war, the cabin rate applied, whereas the Government contended that all non-combatants were embraced within the category of "other persons," who under the contract were to be carried in the steerage and paid for at the steerage rate.

The court rejected the first and second counterclaims of the Government and allowed the third. It sustained the contention of the United States as to the number of persons carried to Spain and the rate of transportation which governed, except it was held that Ceballos & Co., instead of being paid half adult steerage rate for the transportation of minor children, should have been allowed the full adult rate for each child, and judgment was entered on that basis, in favor of Ceballos & Co., for the sum of $5,391.25. 42 Ct. Clms. 318.

Without hereafter reproducing the findings verbatim, we

shall state, in a condensed form such of the facts found as we think material to be recited.

Ceballos & Co. alone have appealed and the argument at bar on their behalf has been confined to two questions. 1, the construction of the contract in respect to the persons entitled to be carried at cabin rates; 2, the correctness of the action of the court below in disallowing the claim for the alleged transportation of 198 persons, asserted to have been actually carried under the contracts.

The court below substantially followed the construction of the contract adopted by the Attorney General, and decided that the "higher rate" specified in the contract related to one class and the lower rate to another class, and within the second class the contract embraced priests, nuns, sisters of charity, all women and children and every other person designated within the term "prisoners" by the United States, and whether carried in the cabin or steerage. Civil officials were held entitled to be classified with military officers and their transportation properly chargeable at the cabin rate.

In disposing of the questions arising for consideration we will first consider that relating to the 198 persons claimed by the appellants to have been transported to Spain, but for whose transportation the United States refused to make payment. As already mentioned, for the first twenty-five shipments of prisoners of war from the Philippine Islands to Spain payment was made by the Government of the United States upon the certificates of the masters of the respective ships on which said prisoners of war and other persons were transported, showing the different classes of passengers certified to be correct at the place of landing.

The method of determining the persons entitled to transportation under the written contract was, however, changed as to the last fifteen shipments—running from February 20, 1900, to July 14, 1901, during which time it is claimed said 198 persons were carried to Spain—so that requests for transportation with reference to available space were required to

be made upon the appellants. Thereupon the United States quartermaster at Manila made demand upon the appellants in writing to furnish transportation "to the following Spanish prisoners," separately enumerating, as the case might be, the number of commissioned officers, the number of enlisted men, the number of civil officials, the number of wives of officers and officials, the number of children under three years of age, the number of children between three and ten years of age, the number of children over ten years of age, etc.

Pursuant to the requisition of the Quartermaster General all the men who were placed on the list of passengers for each shipment were required to be at a particular place at a certain time in the morning, and they were counted by an officer of the Quartermaster's Department and taken aboard launches and carried out to the Spanish vessel ready to sail; and as they went on board the persons mentioned in the requisitions were counted by another United States officer, accompanied with the officer who represented the steamship company. Occasionally permission was given to officers of considerable rank to go aboard in their own conveyances, and these were checked off when they went aboard by an officer representing the Government and an officer representing Ceballos & Co., and were thereby included in the numbers called for by the requisitions.

No objections were offered by Ceballos & Co. at the time of the change in the method of computing the number of persons to go aboard.

The 198 persons in question were not embraced in the requests sent by the quartermaster for transportation nor were they included in the count at the time and place of embarkation. The accounts presented to the Treasury for payment asked compensation for the transportation of such persons, based upon certificates signed by the American consul at the landing place in Spain, to the effect "that the following Spanish prisoners," classifying the persons substantially as in the requisitions above referred to, had been "furnished transportation from Manila, P. I., to Spain," by the appellants on a

named steamship. For the reason that the method pre-
scribed by the contract for determining the initial fact that the
persons had been taken on board in the Philippine Islands by
the appellants had not been pursued, and further because the
evidence did not establish to the satisfaction of the court that
said 198 persons, although certified by the consul to have been
landed in Spain, were entitled to transportation under the con-
tract, the Court of Claims refused to make any allowance for
the transportation of such persons. The passages of the con-
tract relating to this branch of the controversy are as follows:

"An account of the number of officers, enlisted men, or
other persons to be taken at the time of embarkation by a
representative of the Government of the United States and a
representative of the said J. M. Ceballos & Co., and payment to
the said company shall be made upon the basis of the number
of officers, enlisted men, and persons counted on each ship."

After reciting the compensation to be paid, the contract
recited:

"The said sums to be due and payable upon evidence that
said officers, enlisted men, or persons have been transported,
subsisted, and delivered on shore in Spain."

In refusing to make any allowance for the asserted trans-
portation of these 198 persons, we cannot say, in view of the
findings of the court below, that error was committed.

We come to consider the remaining subject of contention,
which is thus succinctly stated in the third specification of
error made in the brief of counsel for Ceballos & Co.: "The
court erred in holding that the wives and children of Spanish
officers, civil and military, and other non-combatant prisoners
of war, although transported as first-class passengers and af-
forded cabin accommodations aboard ship, were to be paid for
at the third-class rate specified in the contract, to wit, $73.75."

The principal question involved in this assignment is
whether the United States shall pay cabin rates for the trans-
portation of the wives and children of Spanish officers, and
other officials of equal rank, who were in fact returned to

Spain with such officers as cabin passengers. As stated in the findings the oral agreement made in October or November, 1898, between Ceballos & Co., and the Secretary of War was "to transport such of the Philippine prisoners as the United States desired to return to Spain," the compensation therefor to be fixed by the written contract which was expected to be thereafter entered into. There was no substantial change in the method of carrying out this oral contract from that pursued with respect to the Cuban contract. In the Philippines, as in Cuba, the United States tendered with the military officers and civil officials which it desired carried to Spain their wives and children. The proposals invited as the basis of a written contract, were couched in similar phraseology to that employed in the Cuban contract, and called for proposals for the transportation "of the Spanish prisoners of war now in the Philippine Islands . . . in number estimated as about 16,000 officers and enlisted men." When, therefore, Ceballos & Co. submitted a bid for furnishing such transportation, in reason they held themselves out as ready if the United States tendered for transportation the wives and children of the officers and enlisted men of the Spanish forces to regard them as entitled to the same treatment required by the Government for the head of the family. We cannot impute to the parties to the contract an intention to condemn and refuse to give effect to the practice which had been pursued in carrying out the oral agreement, that is, the treating the wives and children as entitled to transportation and as being for the purpose of the accommodations to be furnished, of the class to which the Government had in effect assigned their male relatives. That the classification referred to as "such other persons as may be designated by the Secretary of War" was not intended to embrace the wives and children of officers, is, it seems to us, manifest from the entire text. The Government was concerned not only with the furnishing of safe but of comfortable accommodation to those who were to be carried on the long voyage from Manila to Spain. It exacted from

Ceballos & Co. a stipulation that it should provide "safe and comfortable transportation" for those to be carried; the officers with "cabin accommodations," and "third-class or steerage accommodations, space and ventilation to be supplied for the enlisted men and other persons on board each ship." It is to be presumed that the agents of the United States in the Philippines saw to it that this stipulation of the contract was observed. It is inconceivable, however, that the Government or the appellants intended to commit such an act of inhumanity as would necessarily have arisen if the written contract required that the family of an officer should be separated from the husband and father on shipboard and be relegated to the discomforts of the steerage and the society of enlisted men and other persons. Clearly the spirit of the contract is opposed to any such conception. The wives and children of the officers and enlisted men were associated with them in the written terms of capitulation of the Spanish forces at Manila, signed August 14, 1898, the fifth article which, again reproduced, is as follows:

"All questions relating to the repatriation of officers and men of the Spanish forces and of their families, and of the expenses which said expatriation may occasion, shall be referred to the Government of the United States at Washington."

Under the Cuban contract the wives and children of officers were treated as entitled to be classed with the head of the family in respect to the accommodation to be supplied, and in the performance of the Philippine oral contract a like practice was pursued. In effect, therefore, by a course of conduct the United States had associated the wives and children of the officers and enlisted men with such officers and men for the purpose of the transportation to be furnished and the treatment to be accorded them on the homeward voyage. Just as in the opinion rendered by the Attorney General, civil officials of equal grade with military officers were assimilated to such officers in construing the terms of the contract, so we think an enlarged meaning must be taken as intended by

the terms officers and enlisted men where employed in the written contract. As observed by the Attorney General, in the light of the purpose of the contract, which was to carry out the engagements made by this Government with Spain, a liberal construction should be accorded to the terms employed in order to effectuate to the fullest extent the purposes intended by the treaty. Construing the written contract of March 4, 1899, according to its manifest spirit, and looking to the prior conduct of the parties, we are of opinion that such contract and the oral contract which was dependent upon it, so far as the wives and children of officers and enlisted men were concerned, should receive the same construction as under the Cuban contract, viz., that the wives and children of Spanish officers tendered by the United States for transportation were to be classed with such officers and the wives and children of enlisted men were to receive like accommodations as were given to enlisted men.

As it is not questioned by the United States that civil officials representing the Spanish government in the Philippines were entitled, both under the oral and written contracts, to cabin accommodations, we have assumed that construction to be well founded. It follows from the reasoning heretofore employed that the wives and children of such officials were likewise entitled when tendered by the agents of the United States for transportation to receive cabin accommodations, and Ceballos & Co. on furnishing such accommodations were entitled to compensation at the rate stipulated for cabin service. In view, however, of the distinction shown to have been made in the requisitions for space between adults and minor children, the practice shown as to payments made under the contract and the original demand of Ceballos & Co. in the court below, we think it results that the parties in actual practice treated the full rate for children under ten years as but half the adult rate specified in the contract, and we think that rate ought to have been applied by the court below for each minor child, whether carried in the cabin or in the steerage.

We are unable to yield our assent to the contention that other non-combatants than the wives and children of officers, enlisted men, and officials of the government of Spain should be embraced in the class entitled as of right to cabin accommodations for which appellants were entitled to be compensated at cabin rates. The mere circumstance that a particular person, although a non-combatant, was a constructive prisoner, did not—at least in the absence of evidence that the United States tendered such person as a cabin passenger—serve to take the person out of the category of persons whom the Secretary of War might designate to receive transportation in the steerage at third-class rates.

From finding XIV it appears that the wives and children above the age of ten years of military officers and civil officials aggregated 1,327, and that the appellants were paid for the transportation of each the steerage rate of $73.75, instead of the cabin rate of $215 each. The appellants are, therefore, entitled to a further payment on account of the transportation of such persons of $141.25 each, in all, $187,438.75. It is also shown in such finding that the number of children of Spanish military officers and civil officials who were carried to Spain and were under the age of ten years aggregated 395, and that Ceballos & Co. were paid for their transportation $36.87½ each, one-half the adult steerage rate, instead of $107.50 each, one-half the adult cabin rates. Ceballos & Co. were, therefore, entitled for such service to a further payment as to each child of $70.62½, aggregating for the 395 children $27,896.87. From the total of these sums, viz., $215,335.62, must, however, be deducted the overpayment recited in the third counter-claim (which counter-claim the court below sustained), viz., $9,721.25, leaving due to Ceballos & Co. the sum of $205,614.37.

It results that the judgment of the Court of Claims must be reversed, with instructions to enter a judgment in favor of the appellants for the sum of $205,614.37, and

*It is so ordered.*