ABRAM H. COLMARY AND PATRICK J. MONOGHAN,
Co-Partners, Trading as A. H. Colmary & Co.,

*vs.*

JOSEPH T. FANNING, Use of Sadie McS. Colmary.

*Negotiable instruments: assignment; re-assignment; suit by
original assignee. Savings bank accounts: to order of
depositor or another, or survivor; not absolute gifts;
possession of book. Husband and wife.*

Where the payee of a note has assigned it, and the assignee
subsequently reassigns the note to the payee, an action on the
note by such original *assignee,* to the use of the original payee,
will lie. pp. 563-564

In general, a trust does not arise where there was no inten-
tion to declare one. p. 566

Where a married woman has money of her own in a savings
bank, to which the husband makes occasional contributions, and
the deposit books are in the wife's possession, being only given
to the husband for him to make deposits, and once or twice for
him to make withdrawals for her, the fact that by the entry
in the books the money is subject to the order of the wife, and
"are subject also to the order of the husband, * * * or to the sur-
vivor," does not amount to a gift to him of the money in the
banks, and the money remains hers, subject to the husband's
right to the balance remaining at her death. pp. 564-565

*Decided January 12th, 1915.*

Appeal from the Baltimore City Court. (Elliott, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Wm. L. Marbury* and *Frank Gosnell* (with a brief by *Marbury, Gosnell* and *Williams*), for the appellants.

*Wm. J. O'Brien, Jr.,* and *J. Kemp Bartlett* (with whom was *Edgar Allan Poe* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a judgment of the Baltimore City Court, recovered by the plaintiff on certain promissory notes of the defendants.

The *narr.* contains the common counts, and eight special counts, alleging the execution by the defendants of eight promissory notes, payable on demand to the order of Mrs. S. McS. Colmary, one dated December 1st, 1899, for $2,000; one dated May 1st, 1900, for $2,000; one dated January 1st, 1901, for $2,000; one dated February 1st, 1901, for $1,000; one dated January 4th, 1902, for $3,000; one dated January 16th, 1903, for $1,000; one dated February 9th, 1906, for $2,500, and one dated February 23rd, 1906, for $2,500; and that the defendants paid her the interest thereon up to July 1st, 1908; that Mrs. S. McS. Colmary, after the first of July, for value received, endorsed said notes to the plaintiff, who duly demanded payment thereof, but the defendants did not pay the same. The notes were filed with the declaration, and each is endorsed by the payee.

The defendants pleaded "never indebted as alleged"; that they did not promise as alleged, and limitations, and for a fourth plea, by way of equitable defense, they alleged that Abram H. Colmary, one of the defendants, from time to time furnished additional capital to the firm of A. H. Colmary & Co., and that the agreement was that the defendants should pay the interest on such capital to Abram H. Colmary; that

for each of these advancements of additional capital, by the
direction of Abram H. Colmary, the senior member of the
firm, promissory notes were drawn payable to Mrs. Sadie
McSchane Colmary, the wife of Abram H. Colmary, and
signed in the firm name; that checks of the firm for the inter-
est on the sum represented by each of said notes, were drawn
as and when such interest fell due, payable to the order of
Sadie McSchane Colmary until the 30th of June, 1908; that
each of such checks for interest was endorsed by the said
Sadie McS. Colmary and delivered to her husband, and the
money on said checks was then collected by the said Abram
H. Colmary and used by him for his own purposes; that
since the 30th of June, 1908, the interest on the sum repre-
sented by each of said notes has simply been credited in the
account of A. H. Colmary on the books of the defendants;
that said notes were executed not for the purpose or with the
intention of establishing or acknowledging any indebtedness
of the firm of A. H. Colmary & Co. to Sadie McS. Colmary,
and were not understood by her as creating or acknowledging
any such indebtedness; that the fact was, and was well known
to the said Sadie McS. Colmary, that the said notes were
each and all of them only intended and understood by the
parties concerned to be a convenient form of voucher for the
amount advanced as capital for the firm of A. H. Colmary
& Co. by Abram H. Colmary, and that it was not intended
or understood by any of the parties interested or concerned
that said Sadie McS. Colmary should have any beneficial or
personal interest in such notes or in the money intended to
be represented by them; that great family differences have
arisen between the said Sadie McS. Colmary and Abram H.
Colmary, and that they separated about the month of Octo-
ber, 1908, and that it was only after such domestic differ-
ences arose that the said Sadie McS. Colmary set up any
claim to an interest in said notes or pretended to have any
right or title therein; that the said Abram H. Colmary has
forbidden the payment of said notes to the said Sadie McS.
Colmary or any assignee of her's; that the entire beneficial

interest in said notes is now and has always been in Abram H. Colmary, and was so intended to be by all the parties thereto when they were executed; that the plaintiff received and acquired said notes when on their face they were overdue and dishonored, and that the defendants believe and charge that the plaintiff received said notes without paying any valuable consideration for them, and that he did not receive them in good faith, but that he received them, and afterwards brought this suit, for the wicked and unworthy purpose of aiding the said Sadie McS. Colmary in harrassing and embarrassing her said husband.

The plaintiff joined issue on the first and second pleas, replied to the third plea, alleging that the cause of action did accrue within three years before this suit, and for a first replication, "upon equitable grounds, to the fourth plea by way of equitable defense," alleged that he acquired title to the notes in good faith, "for full and valuable consideration," before they were overdue, and without any knowledge of, or reason to suspect, any of the matters alleged in said plea, and that he brought suit in good faith and not for the purpose of embarrassing, etc., Abram H. Colmary. For "a second replication, upon equitable grounds, to the fourth plea by way of equitable defense," the plaintiff alleged, upon information received since the filing of said plea, etc., that the matters stated in said plea were not true, and, upon like information, averred "that the said notes were given by the said firm of A. H. Colmary & Company in evidence of and as representing money of the said Sadie McS. Colmary loaned by her to the said firm of A. H. Colmary & Company, which notes and the money represented thereby were her own sole and separate property to all intents and purposes, and as and when executed were delivered to her and remained in her possession up to the time of the purchase of the same by the plaintiff." The defendants joined issue on the replication to the third plea, and demurred to the first and second replications to the fourth plea. The demurrers were overruled,

and the defendants joined issue on the replications to the fourth plea.

No question is made, however, in this Court in regard to the pleadings, and the only exception reserved during the trial is to the ruling of the Court on the prayers. The defendants offered four prayers, all of which were rejected by the Court below, but the exception to that ruling so far as it relates to the second and third prayers is not pressed.

The plaintiffs offered in evidence the notes sued on, and proved the signatures of the defendants thereto as the makers, He then proved by Mrs. Colmary, the wife of Mr. Colmary, one of the defendants, that she and said defendant were married in 1879, and that until she discovered his infidelity in 1908, he was always very generous to her and constantly and regularly made her presents of money; that for many years prior to this suit, the business formerly conducted by the defendants under the firm name of Clark, Colmary & Co., and subsequently conducted by them under the name of A. H. Colmary & Company, was and still is very profitable, and that her husband had derived during a period of many years a large income from said business; that as far back as 1880 she opened accounts in her name with various savings banks in Baltimore, and the money deposited therein was made "subject to her own exclusive order;" that she deposited in these accounts her savings from the money given her from time to time by her husband, and that she kept the bank books in a little trunk in her bureau; that the money so given her from time to time by her husband were intended to be and were absolute gifts, and that the money deposited in the savings banks was her "absolute property;" that from time to time, "usually when she was suffering from an affection of the throat which rendered it imprudent for her to leave the house in bad weather," her husband made deposits for her in said banks, but that with the exception of a comparatively short time before she discovered her husband's infidelity, she kept all of her savings

banks books in the little trunk in her bureau, "her husband taking them occasionally only for the purpose of making deposits to her credit and thereafter returning" them to her; that Mr. Colmary "stated to her on numerous occasions that in making her these gifts of money he wanted her to be absolutely independent, and that in the event of anything happening to him she would have the money in the savings banks as her own, independent of his business, so that she would not be embarrassed whilst the business was being wound up, or if anything of an unusual nature should happen." She was shown the pass book issued to her by the Central Savings Bank containing the following entry: "No. 25292. Sadie McS. Colmary also subject to the order of A. H. Colmary, either or the survivor," and asked to state what part of that entry was made in the book when the account was opened in 1888, and she replied: "My name only and also the number 25292," and stated that the name of A. H. Colmary was not entered in the book originally. She was then asked to state under what circumstances the words "also subject to the order of A. H. Colmary, either or the survivor" were entered in the book, and she replied: "As I said this morning, Mr. Colmary has always been very generous with me, and it was an understood thing for many years and years ago that at my death all that I had should go to him; the only stipulations were my two diamond rings, and I agreed that they too should be his as long as he remained unmarried, but everything else was to be his absolutely." She further testified that she executed a will for the purpose of carrying out that understanding, and that he told her that he had executed a will for the purpose of making a like provision for her; that after she executed her will she had a conversation with him about the money she had in the savings banks, in which "He asked me if I would mind having his name put on my bank books, to have the account in our mutual names so that in the event of my death he would not have to pay any Court costs in order to get the balance that might

be in the banks at the time of my death;" that she accord-
ingly went to the Central Savings Bank "and asked them
to put his name on this book," and that they did it without
saying anything; that she told them that she "would like
to have the account made so that if" she "should die the
balance, at" her "death would go to Mr. Colmary without
having to go through the Orphans' Court;" that she could not
recall the exact time that it was done, but that it did not
seem "so awfully long ago;" that the money that was de-
posited in the savings banks was her money, that Mr. Colmary
had given it to her and that for a number of years she
always deposited it herself; that she kept the bank books
in the little trunk, the one referred to in the other case and
what she had said in her testimony was "absolutely" true
with respect to all of her bank books. Her attention being
called to the note dated February 1, 1901, and the entry in
the Central Savings Bank book No. 25292 of a withdrawal
of $1,000 on February 1st, 1901, she stated that she drew
the money out and took it to the factory and gave it to Mr.
Colmary and that he gave her the note; that she got the
money indicated by the entry in the same book of a with-
drawal of $3,000 on January 4th, 1902, and took it to the
factory and gave it to Mr. Colmary and got the note of that
date for that amount; that she got the $1,000 indicated by
the entry in the same book of January 16, 1903, and that she
took that to the factory and got the note of that date for
that amount; that book No. 25292 was practically closed on
January 16, 1903, and that the balance in that book of
$2,999.07 was entered in a new book, No. 71079, opened in
the same bank that day in the name of "Sadie McS. Colmary,
in trust for herself and A. H. Colmary, joint owners, subject
to the order of either, the balance at the death of either to
belong to the survivor;" that she made the withdrawals noted
in bank book No. 71079 except the two of February 9th and
February 23rd, 1906, of $2,500 each, and that these two
were the only sums withdrawn from any of the banks by

Mr. Colmary, and that at the time he withdrew them he handed her the two promissory notes for $2,500 bearing the dates mentioned. She was then shown the pass book issued by the Hopkins Place Savings Bank in 1897 in the name of "Mrs. Sadie McS. Colmary, in trust for herself and A H. Colmary, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor," and she stated that she opened the account herself, and told the officer of the bank just what she told the officer of the Central Savings Bank, viz: that she "would like to have the account so that if she should die the balance remaining in the bank at the time of her death would go to her husband without having to pass through the Orphans' Court," and that the officer of the bank "used a rubber stamp and handed the book out to her without saying anything." She was then asked if she knew what "in trust for yourself and A. H. Colmary meant," and she said it "meant that at my death he would have a right to all the balance that was there in my bank book," and that she told the bank that she wanted to leave the money so that "it would be that way;" that that was what her husband asked her to do, and she was endeavoring to carry out his request; that she withdrew $2,000 of the money she had in that bank and on the same day she handed it to the firm of A. H. Colmary & Company; and that all of the notes sued on were given to her in exchange for currency as she described; that she has not been repaid any of the sums loaned by her to A. H. Colmary & Co. or to Clark, Colmary & Co., and represented by said notes; that at first she put the notes in her bureau drawer, and afterwards she bought the tin box and put them in it and kept the box in her bureau drawer; that she always kept the bank books in her bureau drawer up until, "well, perhaps within a couple years prior to 1908, when Mr. Colmary asked me—at least he suggested rather, that if I would let him have the bank books that he could save me—I had some throat trouble at the time—and he said he could save me the trouble of going

to the bank, that he would send my deposits for me, and if I would give him my books they could be kept at the factory," and that she gave him the books; that there was nothing said about giving him the books so as to give him the money in the bank, and the only ground upon which he made the suggestion, and upon which she gave him the books, was to save her the trouble of going to the bank. When she was asked if she got the books back, she said that after this trouble developed she was advised to get the books and that she asked for them, and as they were not brought to her she told Mr. O'Brien (her counsel) and he spoke to Mr. Colmary about it, and Mr. Colmary said he would bring them back and told her to tell Mr. O'Brien that he had done so, but that he did not bring them all back; that she did not know at the time that he did not bring them all back, but supposed that he had returned them all; that Mr. Colmary then went abroad and she found that there were one or two of her bank books missing; that she told Mr. O'Brien about it and he told her to go and get them; that she had the key of the safe, and that Mr. Colmary had told her to use it if it was ever necessary for her to do so, and had shown her how to open the safe; that her sister, Mrs. McGraw, went with her to the office of the defendants, and when she got there she asked Mr. Jones, the bookkeeper, to open the safe for her and handed him the key for that purpose, and that she found the one or two bank books and took them home. Referring to the notes sued on, Mrs. Colmary stated further "that Mr. Colmary told her one day that he had to go out in the market to borrow some money to tide over a certain season of the year in his business, and that he said to her, now was her chance to take some of the money out of the savings banks and loan it to the firm, and that by so doing she would get double the amount of interest; that this was before she made the first loan represented by the notes mentioned in the declaration and that thereupon; and thereafter from time to time at the request and suggestion of her husband she withdrew the sums of

money represented by the notes in cash from the savings banks and turned the money over to the firm, receiving in exchange therefor the promissory notes sued on, and that the only notes sued on which were not given in exchange for money which she personally withdrew from the savings banks were as heretofore stated the notes dated February 9th, 1906, and February 23rd, 1906, for the sum of $2,500 each, but that these notes were delivered to her at the time when the withdrawals were made from her bank accounts by her husband, and that each loan made was made upon the suggestion of her husband," and that the change made in her savings banks books at the request of her husband "was not made upon all the books." When asked what happened with reference to the payment of the interest on the notes prior to her separation from Mr. Colmary, how it was paid, etc., she said. "Well, he collected it, but as I have already said, he was generous with me, and I did not ask him what he did with it;" that he was always making her very liberal gifts of money, and she was putting some of it away and enjoying the balance; that he was "extremely prosperous in business," and that "He has told me more than once, quite a number of years ago that he would not tell me how much over $10,000 per annum his income was, but he would tell me it was at least $10,000, but that I might have a swell head if I knew how much above that sum it amounted to," and that he was giving her money freely at the time the interest accrued on the notes. Referring to the two notes dated respectively February 9th and February 23rd, 1906, she said "that about that time she was suffering from bronchial throat trouble," and was having serious trouble on account of it, and because of that fact her husband was most considerate and offered to attend to it for her, and to save her from going to the banks; that he handed her the two notes on the day he withdrew the money from the bank, and that they had been in her possession ever since until she delivered them to her attorney. On cross-examination, in reply to the question, "You say you

executed mutual wills, that is, you executed a will leaving everything you might have at the time of your death to him and he executed a will for your benefit?" she said. "He did, but he has since told me that he did not sign it. I signed mine, and it is still in the Safe Deposit and Trust Company. He gave me the impression that he had signed his also."

The plaintiff then proved by A. Leo Jones, the bookkeeper of the defendants, that the ledgers of the firm showed that every one of the loans referred to were credited to and originally opened in the books in her name, and remained in her name until December 31, 1908, shortly after her separation from Mr. Colmary; that at that time her account showed standing to her credit $15,000 together with $450, interest accrued upon said loans from July 1st to December 31st, 1908; that on December 31st he closed Mrs. Colmary's account on the books of the firm and transferred her credit of $15,450.00 to Mr. Colmary's capital account; that he was still the bookkeeper of said firm; that the erasure and the word "cash" written above Mrs. Colmary's account were made by him, but that no cash changed hands and that he had no authority from Mrs. Colmary to make the entry; that he did not remember who instructed him to make it but that he would not make such an entry without instructions from a member of the firm; that the credit to Mr. Colmary's account of $15,000 was the same $15,000 that had been loaned to the firm by Mrs. Colmary and which stood to her credit on the books of the firm until December 31st, 1908, when it was transferred to Mr. Colmary's account; that that was done by simply changing entries in the books and that not a dollar "changed hands"; that he cannot remember and cannot say that Mr. Colmary told him to make the erasure referred to, except that he knew he would not have made it unless Mr. Colmary told him to do it, as no one else had the authority to tell him. The plaintiff then offered in evidence a letter from Mr. O'Brien, attorney for Mrs. Colmary, dated September 18, 1908, to A. H. Colmary & Co., setting out the notes and requesting a check for the interest due thereon, and

the reply of the defendants of the following day, saying that
the amount stated in Mr. O'Brien's letter was $1,000 more
than the outstanding notes, that one of the notes referred to,
for $1,000, had been paid, that according to their records the
interest on the notes had been paid semi-annually in January
and July, and that there would not be any interest due until
January 1st, 1909.   The plaintiff also proved by William
J. O'Brien, Esq., that he was retained by Mrs. Colmary in
the fall of 1907, and that at that time she felt that she had
reason to suspect her husband of infidelity and was "in
serious distress of mind"; that he had a talk with Mr. Col-
mary about it; and he denied it; that in the early part of
1908 Mrs. Colmary told him that her savings banks books
were in Mr. Colmary's office; that she explained that they
had been taken there at his suggestion for convenience in
making deposits for her, but seemed a little disturbed about
it, and that he spoke to Mr. Colmary and told him that he
thought it would make her mind easier if the books were
returned to her; that he said they were perfectly safe where
they were but that he would return them.   When asked if
Mr. Colmary took the position that they were his and that
he had a right to them, the witness replied, "Certainly not.
Several talks I had with Mr. Colmary and he never took the
position that the money in the savings banks was his, nor did
he ever claim that the notes were his.   That claim was made
at a later date."   He further stated that until the summer of
1908 there was no questions raised about the money in the
banks or the notes; that Mr. and Mrs. Colmary went to
Europe in February, 1908, and returned in April, and that
at that time Mrs. Colmary was not confirmed in the correct-
ness of her suspicions about her husband, because he had
vigorously denied them to him and to her; that Mr. Col-
mary returned to Europe in September and came back the
latter part of October, 1908; that after Mrs. Colmary re-
turned from Europe in April she informed him that Mr.
Colmary had again taken some of her bank books from her
bureau drawer, and had sent a messenger boy after the

others, and that as he, witness, did not exactly understand his action, and thought it a little questionable, he advised her to hold on to the books she had, and that in the latter part of 1908 he advised her with reference to recovering the books that Mr. Colmary-had taken; that the first time he saw the notes was in 1907 or early in 1908; that they were endorsed by Mrs. Colmary in his presence in Atlantic City in May, 1909; that a short while after receiving the letter referred to above from the defendants, he wrote to them demanding payment of the notes but received no reply; that Mr. Carter was then senior counsel in the case, and as no litigation had begun between Mr. and Mrs. Colmary, and she was very loath to drag her affairs into Court, and as she at that time was in such a nervous condition that it would have been impossible for her to testify in Court, he and Mr. Carter thought it would be better to sell the notes; that he had a friend in New York, Mr. Joseph T. Fanning, who was a man of means, and that he explained to him that Mrs. Colmary had these demand notes for $16,000; that to the best of his knowledge the credit of the defendants was first class; that the notes were straight and clear as to title; that the interest had been paid up to a very recent date, and suggested to him to buy the notes and to authorize witness to demand their payment, and if not paid to bring suit; that Mr. Fanning agreed to that, and that he then saw Mrs. Colmary, who was at Atlantic City, and got her to consent to sell the notes, to endorse them and to make an affidavit that interest had been paid on them to a certain date, were demand notes, and that they belonged to her; that he then took the notes and affidavit to Mr. Fanning and received from him a check for $14,000 drawn to Mrs. Colmary's order, which she endorsed and witness deposited; that he then loaned Mr. Fanning $14,000 for which he took Mr. Fanning's note and took an assignment from him of the notes in suit and an order to enter the case to the use of witness as collateral security; that later, litigation between Mr. and Mrs. Colmary having been started by the injunction case, etc., and Mrs. Colmary's health hav-

ing improved sufficiently to enable her to go on the stand, he arranged with Mr. Fanning to buy back the notes, by surrendering his note, etc., and this case was entered to the use of Mrs. Colmary. The plaintiff further proved that on the 30th of June and the 31st day of December of each year after the loans to the firm were made the firm issued checks for the interest, and that these checks were endorsed by Mrs. Colmary and paid by the firm, the last interest check being for six months' interest to June 30, 1908; that these checks were turned over by Mrs. Colmary to her husband after she endorsed them, and that she never asked him for the proceeds of the checks because he was constantly giving her money greatly in excess of the amount of the interest on these notes, and that no part of the principal of the notes to the amount of $15,000 had been paid. Mrs. Colmary also testified that "Mr. Patrick J. Monoghan, a member of the firm of A. H. Colmary & Co., once told her in speaking of the notes sued on, that Mr. Colmary had asked him to go out and borrow a certain sum of money to tide over the business during a certain period, and that he, Mr. Monoghan, had replied that he did not have any way of getting it, whereupon Mr. Colmary said, 'Can't you go to the bank,' and upon Mr. Monoghan replying 'no,' Mr. Colmary stated, 'Well, my wife has some money in bank and I will ask her if she wont let us have it as a loan.'"

The only evidence produced by the defendants is the testimony of Mr. Colmary in which he stated, "that he caused the checks to be drawn by the firm of A. H. Colmary & Co. to the order of his wife, Sadie McS. Colmary, for the interest upon said notes semi-annually; that he in every instance had such checks endorsed by his wife and deposited the same in his personal account—that she never received any of the proceeds of said checks; that he, the said A. H. Colmary, never intended the moneys which he gave his wife to deposit in the savings banks should be her absolute property, but that it was subject to his disposal during life."

The instruction asked for by the defendants in their first prayer was that there was no evidence in the case legally sufficient to enable the plaintiff to recover under the pleadings, and their fourth prayer was as follows: "The defendants pray the Court to instruct itself sitting as a jury that the money on deposit in the Central Savings Bank in the name of Sadie McSchane Colmary in trust for herself and A. H. Colmary, joint owners, subject to the order of either of them, when drawn out by said A. H. Colmary became and was his money if it was not his before and that the notes sued on in this case issued by the firm of A. H. Colmary & Company to said Sadie McSchane Colmary, because of the payment of said moneys to said firm by said A. H. Colmary, are without consideration so far as said Sadie McSchane Colmary is concerned, and the verdict of the Court, sitting as a jury, must be for the defendants as to those notes."

In reference to the first prayer the appellants contend, first, that as the plaintiff, Joseph T. Fanning, parted with his title to the notes before the case was brought to trial there could be no recovery in the case; second, that "there was no perfected gift of the moneys in the Central Savings Bank and the Hopkins Place Savings Bank as Mr. Colmary never completely surrendered control of it," and, third, that "the fact that all the deposits in the savings banks were subject to the order of Mr. Colmary and that as to two of the books Mrs. Colmary held the deposits in trust for herself and Mr. Colmary, conclusively shows that Mr. Colmary retained control over the money and did not intend to give it to his wife."

In support of the first proposition the appellants rely solely upon the case of *Heighe* v. *Farmers' Bank,* 5 H. & J. 68. A careful reading of that case shows that the Court treated the claim of the bank, the plaintiff, as having been *paid.* It was not assigned to the party who paid it, and the Court held that full payment to the bank put an end to the suit, and that it could not be further prosecuted for the use of Frazier. Moreover, it was not even shown that the bank was paid

*by Frazier.* In the case at bar the evidence shows that
Fanning was the holder of the notes at the time he brought
the suit, on the 5th of June, 1909, and that he transferred
them to Mrs. Colmary shortly before the case was entered
to her use, in November, 1913. The notes could not be
regarded *as paid,* and we see no reason why the suit could
not be prosecuted for her use to a final judgment. It is in
accord with the practice in at least some of the circuits of the
State, and appears to have been recognized by this Court.
In the case of *Bowie* v. *Duvall,* 1 G. & J. 175, the note was
assigned by the payee before he brought suit on it, and the
suit was entered to the use of the assignee. The Court there
held that the suit could not be maintained because, *at the
time it was brought,* the plaintiff and payee had parted with
his title to the note, and the reasoning of the Court suggests
the view that if the assignment had been made after the suit
was brought it could have been prosecuted to judgment, for
it said that the plaintiff's right to prosecute the case depended
upon the question whether the assignment was made before
the suit was brought. In the case of *McAleer* v. *Young,* 40
Md. 439, where the parties were represented by the late
CHIEF JUDGE McSHERRY and JUDGE FISHER, and the opin-
ion of this Court was written by CHIEF JUDGE BARTOL, it
appears that the note, upon which the judgment there
involved was recovered, was, pending the case, assigned, and
the suit was entered to the use of the assignee, but there was
not a suggestion, either by counsel or the Court, that that
could not properly be done. In 8 *Cyc.* 74-75, a number of
cases are cited in support of the statement: "In a few cases
it has been held that if a plaintiff transfers a bill or note after
commencing suit his suit will abate. The weight of author-
ity, however, is to the contrary, and it has been variously ,
held that the suit may be continued in the name of the orig-
inal plaintiff for the use of the transferee," etc. See also
*Dowell* v. *Mills,* 32 Tex. 440; *Ferry* v. *Page,* 8 Iowa, 455;
7 *Ency. Plea. & Prac.* p. 772. While, of course, an alto-

gether different principle applies where the cause of action
is not a negotiable instrument, still the established right of
the assignee of other contracts for the payment of money
to bring the suit in the name of the assignor shows that no
serious embarrassment or consequences can follow from the
course pursued in this case. 1 *Poe's P. & P.* (3rd Ed.), sec.
325.

In regard to the second and third propositions urged in
support of the first prayer we think there is evidence to show
that the moneys deposited in the bank books were the sub-
jects of absolute gifts to Mrs. Colmary, and that the entries
in these books did not, under the circumstances, confer upon
Mr. Colmary the right to withdraw any part of the money
deposited for the purpose of appropriating it to his own use.
The clear and positive statements of Mrs. Colmary, corrob-
orated by the subsequent issuing of the notes to her; the testi-
mony of the bookkeeper of the defendants, the failure of Mr.
Colmary to make any claim to the books or notes to Mrs.
Colmary's attorney when he requested the return of the books
to her, and particularly his failure, when on the witness stand,
to deny any of the statements made by her in regard to the
circumstances under which the money was given her, the
entries in the books were made, and the notes were issued,
are at least some evidence, and that is as far as we are
required to go in this case, of her title to the money, and that
she did not intend to part with it, and the legal sufficiency
of this evidence is not overcome by his brief and simple
statement that he did not intend to give her the money abso-
lutely. If the money was the subject of an absolute gift to
her then it was beyond his power to revoke it, and the entry
in the bank book of the words "also subject to the order of
A. H. Colmary, either or the survivor" did not constitute a
gift to him of the money deposited in the bank. The *uncon-
tradicted* evidence shows that she retained and intended to
retain the possession of the books, and that he acquired pos-
session of them *only* for the purpose of making deposits for

her, and withdrawing for her the amounts represented by the two notes of $2,500 each, and an hour after this entry was made she could have withdrawn every dollar of the money in the bank. The *uncontradicted* evidence also shows that she never intended to create a trust in favor of her husband that would enable him to appropriate the money during her life to his use, and did not know what the words in trust meant. All that she was asked to do, and all that she attempted to do, was to have his name entered in the book so that, after her death, he could draw out of the bank whatever balance remained in the account. If this testimony is true, and we must assume the truth of it in passing upon this prayer, it is clear that she never intended by the entries in the books, to give him the right to any part of the money during her life, and it is equally clear that he never asked or expected her to do so. There can be no trust where there was no intention to create one, and if Mr. Colmary, knowing that the money belonged to her, and that she did not intend by said entries in the books to part with it or her control over it, during her life, deposited money in the accounts for her, he must have intended the money so deposited by him as a gift to her, subject only to his right to any balance that might remain in the accounts at her death, and he therefore parted with his control over it, and could not thereafter revoke the gift.

That the entry in the bank book of the words "also subject to the order of A. H. Colmary, either or the survivor," did not, without a surrender of the bank book to him for the purpose of enabling him to withdraw the money for *his own use,* amount to a gift by her of the money deposited in that account to him, has been repeatedly decided in this State, and we need only refer to the case of *Whalen* v. *Milholland,* 89 Md. 199, and the cases cited therein.

And that a trust does not arise where there was no intention to declare one is fully sustained by the cases of *Milholland* v. *Whalen,* 89 Md. 212; *Mulfinger* v. *Mulfinger,* 114 Md. 463; *Littig* v. *Mt. Calvary Church,* 101 Md. 494; *Baker* v. *Baker,* 123 Md. 32, and that Mrs. Colmary did not intend

to declare a trust, by the terms of which Mr. Colmary could withdraw any part of the money deposited in bank during her life for his own account, is, we have said, shown by the uncontradicted evidence in the case.

In regard to the fourth prayer, it would seem to follow from what we have said that as Mr. Colmary acquired possession of the bank books *only* for the purpose of making deposits and withdrawing money for her and on her account, he could not lawfully make use of his possession of the bank books for the purpose of appropriating the money to his own use, and the fact that he personally withdrew the sums represented by the two notes of $2,500 each did not make the money, when withdrawn, his, or entitle him to the proceeds of the notes.

On the evidence before us, so far at least as the plaintiff's testimony is concerned, this is not a case where the maker executes his note to the payee as a voluntary gift of the money represented by the note, for here the evidence of the plaintiff is to the effect that the money represented by the notes was the property, at the time the notes were issued, of Mrs. Colmary.

We have carefully examined the authorities cited by the appellants in support of the second and third propositions in regard to their first prayer, and the proposition presented by their fourth prayer, and we fail to find in them authority in conflict with the views we have expressed, and we must therefore affirm the judgment of the Court below.

*Judgment affirmed, with costs.*