NATIONAL UNION MORTGAGE CORPORATION *v.* POTOMAC CONSOLIDATED DEBENTURE CORPORATION ET AL.

[Nos. 21, 22, October Term, 1940.]

*Decided December 17th, 1940.*

The causes were argued before BOND, C. J., PARKE, SLOAN, MITCHELL, JOHNSON, and DELAPLAINE, JJ.

*Carlyle Barton* and *Reuben Oppenheimer,* with whom were *Niles, Barton, Morrow & Yost,* and *Beeuwkes, Skeen & Oppenheimer,* on the brief, for the appellant.

*Frank B. Ober,* with whom were *William A. Grimes* and *Ritchie, Janney, Ober & Williams,* on the brief, for the Potomac Consolidated Debenture Corporation, appellee.

*Frederick W. Brune,* with whom were *Edwin F. A. Morgan, David R. Owen,* and *Semmes, Bowen & Semmes,* on the brief, for the Maryland Casualty Company, appellee.

*Russell L. Snodgrass,* with whom was *James W. Close* on the brief, for the Reconstruction Finance Corporation, appellee.

MITCHELL, J., delivered the opinion of the Court.

During the period preceding the nation-wide depression which broke in 1929, what were commonly known as mortgage companies sprang into existence and proved to be attractive outlets for millions of dollars then held by investors. The plan under which these companies operated was that of issuing bonds against the security of mortgages upon real and leasehold property held by them and selling these bonds to the investing public. To add to the attractiveness of the class of investments above indicated, the companies elicited the co-operation of surety corporations, to the end that the latter, for an agreed premium, would guarantee said bonds, both as to the payment of the interest accruing thereon, and the principal upon the maturity thereof.

In the course of its regular surety business, The Maryland Casualty Company (hereinafter called Maryland) was one of the surety companies which extensively engaged in the mortgage bond guaranty business, there being in 1933, the period in which the depression reached its climax, approximately $50,000,000 of mortgage company bonds outstanding, back of the security of which the guaranty of Maryland was pledged. The rapid shrinkage in the value of the property securing the mortgages and the consequent loss of income to the mortgage

companies resulted in the practical insolvency of many of the latter companies, and demands upon sureties for the fulfillment of their guaranties.  As a result of that situation Maryland suffered and paid losses of approximately $17,000,000 on account of its mortgage guaranties, for which it received unliquidatable assets of uncertain value.  In line with the general depression then existent the surety had suffered substantial losses in other branches of its business, and its guaranties upon the bonds were accordingly regarded as being of little, if any, financial value. The guarantor was therefore confronted with losses which, unless in some way averted, were, with reasonable certainty, destined to bring about its own liquidation.

The same situation, to a greater or less degree, confronted other large surety corporations, which under prosperous and favorable conditions had engaged in the business of guaranteeing mortgage bonds.

To meet this crisis, certain investment banking houses which had been active in marketing mortgage bonds guaranteed by Maryland, as well as like bonds guaranteed by United States Fidelity & Guaranty Company (another large surety corporation in the City of Baltimore), in conjunction with the mortgage companies involved, with interests representing bondholders, and with representatives of the two surety corporations above mentioned, thereupon sought the aid of the Reconstruction Finance Corporation, a federal agency, with a view of securing such financial assistance as would enable the obligors and their sureties to formulate a refunding plan for submission to bondholders.  At the incipiency of negotiations looking to an ultimate refinancing plan, the outstanding bonds guaranteed by said two surety corporations aggregated $86,461,900, and at that time these bonds were selling at from thirty to forty cents on the dollar.

The plan contemplated an offer to the holders of said bonds whereby the holders were to exchange their bonds for either:

Option 1: An equal principal amount of mortgage secured bonds of a new mortgage bond company to be organized; the new bonds to mature in twenty years, and to bear interest at the average rate of 3.5 per cent, and to be guaranteed both as to principal and interest by the surety of the issue exchanged for the new bond; said bonds were to be secured primarily by pledge of the collateral trust bonds surrendered by holders accepting Option 1, or a *pro rata* amount of the mortgages constituting part of the security for the bonds of such issue.

Option 2: An amount of cash equal to thirty per cent of the principal amount of the bonds surrendered, plus an unsecured debenture, of a new debenture company to be organized, in an amount equal to seventy per cent of the principal of the bonds surrendered; the debentures were to mature in twenty years, to bear interest at the average rate of 4.35 per cent over the twenty year period, and were to be guaranteed by the surety as to fixed interest only.

One group of six mortgage companies, for which the plan contemplated the formation of a single debenture corporation, had outstanding $9,698,300 aggregate principal amount of bonds; and the debenture corporation, later formed in consummation of the plan for these six companies, is one of the defendants herein, Potomac Consolidated Debenture Corporation.

The plan was submitted by the refunding plan managers to the holders of said $9,698,300 mortgage bonds by circular dated June 7th, 1933, which explained the plan with detailed description of Option 1 and Option 2, and urged bondholders to deposit their bonds immediately under one or the other of said options. Of the aforesaid $9,698,300 bonds, $1,750,400 were deposited under Option 1, and $7,781,400 were deposited under Option 2. (The percentage basis thus was, Option 1, 18.1 per cent.; Option 2, 80.2 per cent.; undeposited, 1.7 per cent.)

The plan was declared effective and Potomac Consolidated Debenture Corporation was formed. It secured loans from Reconstruction Finance Corporation in the

amount of $2,567,862, and paid in cash, by way of thirty per cent on account, to old mortgage bonds deposited under Option 2, the sum of $2,334,420, and also paid on account of accrued interest on said bonds the sum of $177,536.85.

With reference to the plan as applied to the approximately $50,000,000 old bonds identified with the guaranty of Maryland, over 99 per cent were deposited under the refunding plan; approximately 24.5 per cent thereof were deposited under Option 1, and approximately 75.5 per cent thereof under Option 2. Pursuant to the plan, $11,524,800 principal amount of new mortgage bonds were issued to persons electing Option 1; and $26,127,430 principal amount of new debentures were issued, and $11,197,470 in cash principal was paid, to persons electing Option 2.

To effectuate the refunding plan the Reconstruction Finance Corporation first loaned the sum of $17,500,000 to the surety for its own rehabilitation and, secondly, loaned to new debenture companies, identified with the guaranty of Maryland, approximately $12,000,000; which loans were secured by a pledge of the assets of the debenture companies and the guaranties of the surety. The holders of original mortgage bonds, of the six mortgage companies comprising the group to which reference has been made, thereupon deposited those bonds with Maryland Trust Company as depository, and on June 10th, 1933, became parties to a deposit agreement entered into by and between the Potomac Consolidated Debenture Corporation, a newly created corporation (hereinafter called Potomac), Maryland Trust Company, depository, and the depositing bondholders.

The above deposit agreement fixed the terms and conditions under which bonds deposited under Option 1 were to be exchanged for new mortgage bonds, and those deposited under Option 2 for cash and new debentures.

A debenture agreement, as of December 1st, 1933, between Potomac and Maryland Trust Company, trustee, was thereupon executed, and to that agreement Maryland

also became a party, as guarantor of the fixed interest only, upon the debentures to be issued thereunder.

Under the terms of its agreement with Reconstruction Finance Corporation, all assets of Potomac were pledged to the former as security for loans aggregating $2,567,-862; and that indebtedness having thereafter been fully repaid through the liquidation of its pledged assets, the remaining assets of Potomac were returned to it on July 28th, 1938, discharged from the obligations of the above pledge. Since said date that corporation has been directly receiving the proceeds accruing from the liquidation of its remaining assets.

Article III, section 2, sub-section 4, of the debenture agreement of December 1st, 1933, to which reference has been made, provides as follows:

"4. That after the repayment in full of the indebtedness of the (Potomac) corporation to the Reconstruction Finance Corporation, all principal collections and amounts received in liquidation of its assets shall be used only for any or all of the following purposes and within said limitations the Corporation shall designate such use, viz.:

"(a) For the redemption of debentures in the manner hereinafter provided in Article V of the agreement;

"(b) for the purchase of debentures at the lowest price offered, not exceeding par, after advertisement for tenders. Such advertisement to be as provided in Article V hereof as regards time, place and length of notice.

"(c) For the purchase of debentures at public or private sale at a price not to exceed par."

In the final analysis, the decision in the instant case rests upon the construction of the above-quoted sub-section; the proceedings in said case having originated from two actions instituted in the Circuit Court No. 2 of Baltimore City, under the provisions of chapter 294 of the Acts of 1939, known as the Uniform Declaratory Judgments Act, which cases were thereafter consolidated.

Both of the original suits were instituted by the National Union Mortgage Corporation, the appellant,

and were brought against Potomac, Maryland, Maryland Trust Company, trustee under the debenture agreement with Potomac, dated December 1st, 1933, and Maryland Trust Company and Joseph A. Wherrett, trustee under an indenture of trust, dated January 1st, 1934, from National Union Mortgage Corporation, securing an issue of twenty-year collateral trust bonds, Series A, of said mortgage corporation. Upon the petition of the Reconstruction Finance Corporation, the latter corporation was thereafter permitted to intervene as a party defendant in each case.

The allegations in the respective bills of complaint filed in the two original cases are in effect similar, except that in the last suit brought the bill prays, in addition to the relief sought in the first complaint, that Potomac may be enjoined from purchasing with funds derived from the process of liquidating its assets, any of its outstanding debentures at a price or prices in excess of the fair value thereof, as measured by the fair salable value of the assets held by Potomac at the time of such purchase. With the latter distinction as between the two complaints, in addition to some of the facts hereinafter detailed, the bills of complaint allege that, at the time the suits were brought, there were $3,590,000 face amount of twenty-year debentures of Potomac issued and outstanding, under the debenture agreement to which we have referred, and in the hands of more than 1500 owners; that the plaintiff, the appellant corporation in this appeal, is the owner of $453,880 of said debentures, which said debentures are pledged by it with Maryland Trust Company and Joseph A. Wherrett, trustees under an indenture of trust, dated January 1st, 1934, from the plaintiff; that Potomac was formed for the purpose of carrying into effect the refunding plan hereinafter outlined; the pledge of its assets to Reconstruction Finance Corporation for loans made to it by the latter corporation in accordance with the terms of the debenture agreement; the full repayment of said loans from proceeds derived from the liquidation of its assets, and that its remaining

assets were then held by it. Furthermore, that Potomac had at all times conducted its business solely for the purpose of the liquidation of the assets acquired by it pursuant to the general refunding plan; that its business and operations were limited to such liquidation and that it was, under the general refunding plan, intended to be a liquidating company charged with the liquidation of assets acquired by it, for the benefit of the owners and holders of its debentures.

It is then alleged that Potomac is owned and controlled, through ownership of its entire capital stock, by Maryland; that the latter dictates and controls the selection of its board of directors and officers; directs the management of its affairs, including, but not by way of limitation, the liquidation of its assets and the application of the proceeds of such liquidation; that the value of the assets of Potomac is considerably less than the amount of its liabilities; and that the obligation of Potomac under the debenture agrement to pay the principal of its debentures, when and as such principal becomes due and payable, has become impossible of performance.

Generally, it is charged that Potomac and Maryland occupy a fiduciary relationship to the plaintiff and all other holders of Potomac debentures; that said owners are the equitable owners of the assets of Potomac; and that while occupying such relationship, Maryland and Potomac, on or about August 9th, 1938, caused to be sent, to all known owners of Potomac debentures, a call for tenders thereof, accompanied by a computation sheet which, as to debentures of Potomac, based upon the then liquidating value of the remaining assets of the corporation, as compared with its remaining liabilities, fixed the liquidating value, as of said date, of Potomac debentures, at $43.69 per $100. And it is submitted that any use of the funds realized from the liquidation of the assets of Potomac, after the repayment of its loan from Reconstruction Finance Corporation, to acquire debentures at a price in excess of the actual liquidating value, would be in violation of the terms of the debenture agreement;

of the rights of Maryland Trust Company, trustee for the debenture owners under said agreement; and of the plaintiff and all other owners and holders of debentures similarly situated, as well also as in violation of the alleged fiduciary duties owed by the defendants, Maryland and Potomac, to Maryland Trust Company as trustee, and to the owners of said debentures.

While, therefore, the bills of complaint do not question the legal right of Maryland to purchase with its own funds debentures issued by Potomac, in any amount and at any price it elects, they nevertheless submit that Maryland cannot exact from Potomac, either directly or through its wholly-owned subsidiaries, upon the occasion of any call for tenders or at any time, a' price greater than the actual liquidating value of said debentures, as of the time of their purchase by Potomac. In this connection the complainant sets forth that, pursuant to said call for tenders by Potomac, a large block of its debentures was purchased by Maryland, at prices in excess of the liquidating value thereof as estimated by the defendants, Maryland and Potomac, at the time of said call.

It is further alleged that, in said transaction, so much of the purchase price of said debentures as was in excess of the liquidating value of the same was advanced by Maryland or its wholly-owned and controlled subsidiary or agent, and that the remaining purchase price, based on the actual liquidatng value of the assets securing said debentures, was paid by Potomac. Furthermore, that Potomac has entered into an agreement with Maryland to reimburse Maryland or its subsidiary or agent the excess liquidating value incident to said transaction, at such time and in such manner, and from such assets, as may be authorized by a court of competent jurisdiction in an appropriate action brought for the purpose of determining the rights and duties of Potomac with reference to the use and application of all principal collections realized in the liquidation of its assets.

In "Stipulation A," which appears in the record, it is shown that Maryland, as a result of calls for tenders under the debenture agreement identified with Potomac,

purchased $1,679,370 face amount of Potomac deben-
tures at a cost of $962,707.31, which was at that price
$228,990.50 in excess of the liquidating value of the de-
bentures so purchased. These debentures were sold or
resold by Maryland to Potomac at cost, under contracts,
copies of which are filed with Maryland's answer to the
first bill of complaint, upon the terms alleged in said bills
as above set forth; and it is submitted, by both Maryland
and its subsidiary Potomac, that under the true con-
struction of article III, section 2, sub-section 4, of the
debenture agreement, as hereinbefore quoted, the con-
tract designed to secure Maryland's excess payments as
indicated are valid, and consequently legally enforceable.

The decree of the chancellor is to the effect that under
the true meaning and construction of the debenture
agreement dated December 1st, 1933, cash in the hands
of the defendant, Potomac, representing principal col-
lections upon or proceeds of liquidation of its assets, can,
and must within a reasonable time after being realized
by said defendant, be used (a) for redemption of deben-
tures in accordance with article V of the debenture
agreement, or (b) for the purchase of debentures at the
lowest price offered, not exceeding par, after advertise-
ment for tenders, or (c) for the purchase of debentures
at public or private sale at a price not to exceed par, all
as provided in article III, section 2, sub-paragraph 4, of
said agreement; and that such use and application of said
principal cash for the acquisition of debentures shall be
made within the limitations as to price, namely, that the
price of debentures shall not exceed par, expressly set
forth in the debenture agreement, and without regard to
the *pro rata* share of the asset value or liquidating value
of the debentures at the time or times of acquisition
thereof, and without regard to any other restriction or
limitation not expressly stated in said article III, section
2, sub-paragraph 4, of the debenture agreement.

By the decree the bills are dismissed in so far as they
seek to enjoin Potomac from acquiring its debentures at
a price in excess of the liquidating value thereof, or to
enjoin the defendant Maryland from insisting upon Po-

tomac's obligation to acquire its debentures through the use of principal cash coming into its hands at prices not in excess of those fixed by the above article, section and sub-paragraph, but which may exceed the liquidating value of said debentures. And by said decree all agreements or contracts between Maryland and Potomac designed to obligate the latter corporation to pay for debentures in the future sums aggregating $228,990.56 are construed to be in conflict with article III, section 2, paragraph 1, of the debenture agreement, which prohibits Potomac from voluntarily incurring obligations, other than those to Reconstruction Finance Corporation, or those incurred by it in due course in the operation incident to the liquidation of its assets, so long as any part of its debentures are outstanding. The decree, nevertheless, ratifies the transaction between Maryland and Potomac for the sale to Potomac of debentures in the aggregate par value or principal amount, to the extent that the total amount of principal cash paid by Potomac to Maryland was sufficient to purchase and pay for, at the average cost of $57.32½ per $100 par value, debentures purchased by Maryland under the call for tenders.

From the above decree this appeal was taken, and as has been indicated, the basic question which the appeal presents turns upon the meaning of article III, section 2, sub-section 4, of the debenture agreement.

Article V of the debenture agreement provides for the redemption, in whole or in part, of debentures at par and accrued interest, and the main issue therefore is: Whether Potomac is authorized and required to use principal cash, derived from the liquidation of its assets, to acquire its debentures for the purpose of cancellation at the best prices obtainable, not exceeding par, as contended by the appellees, or whether Potomac in acquiring its debentures is restricted to paying therefor a price not exceeding the *pro rata* share of the estimated liquidating value of its assets, as contended by the appellant?

To determine the above question it will be helpful to review the circumstances and conditions existent at the time of the formation of Potomac, and which led to its

incorporation. These are fully set forth in a voluminous record embracing correspondence, circulars, and prospectuses written or circulated, respectively, (a) by officers of Maryland, and (b) by various banking firms which had been instrumental in negotiating the sale of mortgage company bonds bearing the guaranty of Maryland; which banking firms, because of the moral obligation owed by them to their clientele, became active and effective factors in inducing mortgage bondholders to become parties to the refunding plan.

A careful review of the record leaves little doubt that at the time the refunding plan was formulated, all interests concerned (except perhaps some bondholders who were not aware of the true financial status of the mortgage company and its guarantor) realized that the then nation-wide depression threatened the bankruptcy of the guarantor of the bonds as well as the mortgage companies issuing the same. But for that condition the refunding plan would not have been favorably considered by the bondholders. They co-operated in the adoption of the plan not through choice, but because they were convinced that a condition and not a theory confronted them. For a thirty per cent payment on their bonds, plus all interest then due, some of these holders, in fact a vast majority of them, released the surety from its guaranty of interest at a rate approximating 6 per cent, and accepted a rate based in on an ascending scale which averaged about 4.35 per cent. Furthermore, they released the surety from its obligation to pay the principal of their bonds upon the maturity date.

Correspondingly a minority of said bondholders accepted Option 1, whereby they received a reduced income rate averaging 3.5 per cent, and, receiving interest then due, but no payment on account of the principal of their bonds, elected to accept the same guaranty they then held from the surety, namely, a guaranty as to both interest and principal.

Potomac was formed for the purpose of effecting the plan, but obviously the stream could rise no higher than its source. Its mere creation did not in itself enhance the value of the assets turned over to it by its defaulting

sponsors. In brief it was created purely as a liquidating corporation, charged with the duty of liquidating the assets which came into its custody and applying the proceeds thereof towards the payment of the liabilities it assumed at the time of its creation. Insolvent from the beginning, its duties were defined and limited in no uncertain language, as is shown by documentary and other evidence appearing in the record.

In its carefully prepared brief the appellant urges that all debentures purchased by Potomac under the terms of the debenture agreement shall be held by it, in the nature of a sinking fund, pending the period of final maturity of the same, to the end that Maryland may be made to fully comply with the interest guaranty embodied in said agreement. As viewed from an equitable standpoint, it is submitted that if Potomac is permitted to use the proceeds realized from the liquidation of its assets, for the purchase and cancellation of its debentures from time to time, a situation may develop by which debenture owners who elect to sell debentures prior to the maturity date may so exhaust the assets of Potomac as to leave no assets for the payment of any amount to debenture owners who hold their security until the maturity date.

As against the possibility of ultimate loss through the inability of Potomac to pay its remaining debentures at the time of their maturity, however, it may be observed that the debenture owner who does not sell his debenture at the tender or market price and take his loss, before maturity, will at least have the advantage of a guaranteed interest rate of 4.35 per cent, based on the par value of his investment, until the maturity date of his debentures. The loss which original investors sustained in bonds of the involved mortgage companies as guaranteed by the involved surety occurred before the refunding plan was formulated. And in the light in which the plan was adopted and Potomac, an admittedly insolvent corporation, was created, it is beyond reasonable expectation that the original loss will ever be regained. However, regardless of the above observation, it is not for the

court to redraft the contracts designed to protect all parties concerned, as of the date when those contracts were entered into. The question before the court, stated differently, is: Does the debenture agreement clearly and unequivocally set forth the rights, duties and liabilities of the parties thereto, or does some ambiguity exist in said contract which is the subject of judicial interpretation or construction? The section primarily involved is article III, section 2, sub-paragraph 4, as quoted. The wording there used is clear and definite, and is not veiled in language susceptible of more than one interpretation. The words "not exceeding par" or "not to exceed par," as used in section 4, are well recognized and understood by all persons familiar with sales of securities. Potomac is given the power to designate, within limitations, the uses therein set forth.

It is a well-settled rule of law, as stated by Judge Offutt in *Buffalo Pressed Steel Co. v. Kirwan*, 138 Md. 60, 66, 113 A. 628, 630, that "where the language of the contract is clear, free from ambiguity or doubt and complete, there is no need for the construction, and it will not be resorted to. 13 *C. J.* 520." In determining whether or not any uncertainty or ambiguity exists, as well as determining what the real agreement was where such does exist, it is the duty of the court, in ascertaining the intention of the parties, to consider the situation of the parties, the subject matter of the contract, the surrounding circumstances existing at the time, as well as the object to be accomplished as viewed from the whole agreement. *Phoenix Pad Mfg. Co. v. Roth,* 127 Md. 540, 96 A. 762; *Highley v. Phillips,* 176 Md. 463, 5 A. 2nd 824, and cases there cited.

The preliminary discussions, correspondence, representations by the refunding plan managers, the changing of the wording of the deposit agreement at the request of certain banking groups, the financial interest and position of the surety, the resolutions and participation of the Reconstruction Finance Corporation, as well as testimony produced, indicate that there was no uncertainty expressed by anyone as to the purpose of the plan

adopted. It was partially devised, promulgated and approved in its terms by the same interests who now attack the meaning of the provisions of the debenture agreement. The entire purpose of the formation of Potomac was to carry out an orderly liquidation of the assets turned over to it; and this was done for the protection of all parties affected, especially the holders of the mortgage bonds and the surety involved.

The construction which the parties place on a contract by their negotiations and statements at the time of the making of the contract, and their conduct and declarations subsequent thereto, before a controversy has arisen, is extremely significant in determining their intention. *Mattingly Lumber Co. v. Equitable Bldg. & Sav. Assn.,* 176 Md. 403, 5 A. 2nd 458; *Powers Foundry Co. v. Miller,* 166 Md. 590, 171 A. 842; *J. M. Ceballos & Co. v. United States,* 214 U. S. 47, 29 S. Ct. 583, 53 L. Ed. 904.

The appellant contends that there should be read into the above provision of article III, section 2, or that it was the intention, that the section should contain a limitation of price "up to but not exceeding liquidating value." But an examination of the circumstances and facts, the relationship of the parties, and their extensive negotiations before the approval and signing of the debenture agreement, do not sustain this contention.

There is no sufficient evidence in the record to show that Maryland or the Reconstruction Finance Corporation ever expressed in any way, in the negotiations leading up to the execution of the debenture agreement, or ever agreed or committed themselves to, the proposition that there should be a limitation as to the price at which the bebentures could be purchased by Potomac, other than that the price should "not exceed par." Further, the appellant has received certain benefits from the adoption of the refunding plan, namely, the payment of thirty per cent of the par value of the bonds in cash, made possible by the Reconstruction Finance Corporation's participation in the plan, and the increase in market value of the lebentures because of the guaranty of interest by the surety.

Where a creditor concurs in the adoption of a refunding plan the terms of which are precise and definite, and accepts benefits therefrom, he is estopped to attack any of the terms of the plan. *Barbour v. Mitchell*, 40 Md. 151, 161; *Horsey v. Chew*, 65 Md. 555, 5 A. 466; *Presstman v. Mason*, 68 Md. 78, 11 A. 764. This court, in the case of *Waesche v. Thurmont Bank*, 174 Md. 382, 198 A. 728, 733, passing on the same principle of law, said: "And from an examination of the revised plan of reorganization of the bank, we are not convinced that the contention it deprives the plaintiff of his property or money without due process of law is well founded, and especially must this become apparent when it is considered that neither Waesche in his lifetime nor his executor thereafter objected to the plan and had the fair value of the amount of the bank's indebtedness determined and payable in money or in kind, but elected to be bound thereby by accepting its benefits."

It is apparently conceded that the guaranty, on the ascending scale, of interest on the debentures, averaging 4.35 per cent, during the term of the debentures, increased their market value, and it is shown in the evidence that this guaranty alone has a substantial present value. It might, therefore, be observed that if Potomac were limited in the redemption or purchase price to the *"pro rata* share of the fair liquidating value," it would not be able to acquire any of its debentures for redemption, and the purpose for which Potomac was formed, namely, the expeditions liquidation of the assets turned over to it, would fail. This would be true, whether or not Potomac was a subsidiary of Maryland, and whether or not Maryland participated in the call for tenders.

The appellant further contends that if Potomac can "purchase its debentures at a price in excess of the *pro rata* share of the fair liquidating value of the assets held by it," then said debentures "are to be kept alive for the benefit of the remaining debenture holders." The debentures so purchased would be held as a trust, the interest guaranteed by Maryland collected and held for the benefit of the outstanding debenture holders. This would

necessitate the creation of a trust, either express or implied, under the terms of the debenture agreement. But a trust is created only if the settlor properly manifests an intention to create a trust. *Restatement of Law*, 1 *Trusts* 23; *Colmary v. Fanning,* 124 Md. 548, 92 A. 1045, 1048; *Seabrook v. Grimes,* 107 Md. 410, 68 A. 883.

In the case of *Reconstruction Finance Corp. v. Maryland Casualty Co.*, (D. C.) 23 Fed. Supp. 1008, which involved another part of the same refunding plan, Judge Chesnut in the U. S. District Court for the District of Maryland, at page 1012, said: "It is, of course, true that in a situation of this kind the individual holders of one or a few mortgage bonds would naturally not have been in a position to have personal counsel give such comprehensive and meticulous care to the whole series of papers in the plan as was necessarily given by counsel for the Surety Companies and the Plan Managers; but there is no reason to think that the interests of the bondholders were not adequately represented and cared for in the preparation of the papers. * * * The question presented is, therefore, not what rights the bondholders originally had nor whether in electing Option No. 2 of the refunding plan they unwisely made too great concessions to the Casualty Company, but only what are the respective rights under the papers constituting the plan which, it is conceded, was fairly consented to by the present debenture holders without misrepresentation or concealment or undue pressure of any kind from the Casualty Company." And further, at page 1015: "It seems utterly improbable that the provision would not have been expressly and clearly made somewhere in these lengthy legal documents prepared with such care and scrutinized by counsel for so many different interests."

The appellant in its brief and arguments of counsel lays much stress on the case of *Brown v. Pennsylvania Canal Co.*, 229 Fed. 444, 235 Fed. 669, 244 Fed. 980, 250 Fed. 513, decided by the U. S. Dictrict Court for the Eastern District of Pennsylvania and the Third Circuit Court of Appeals. That case is clearly distinguishable

from the present case. There the court was dealing with an operating company, not a liquidating company; and more particularly, the debenture agreement required that a sinking fund be established from earnings for the purpose of paying the principal of the debentures at maturity, and provided that the sinking fund should be invested in the bonds of the canal company or other securities. Obviously, the sinking fund established was to be held in order to insure the payment of the principal at maturity. No such provision is made in Potomac's debenture agreement; and it seems clear that the parties to the agreement did not believe that Potomac would be in a position to pay the principal of its debentures at maturity; if a sinking fund had been contemplated, it undoubtedly would have been set forth in definite terms in the debenture agreement.

All of the evidence indicates that the relationship between Potomac and the holders of the debentures was that of debtor and creditor, as expressed in the debentures, and the duty of Potomac and the trustee was to see that the funds realized from the liquidation of the assets were utilized for the purchase and redemption of outstanding debentures, thereby bringing about an orderly liquidation.

It should also be borne in mind that the effect of Potomac holding the bonds which it purchases, and requiring Maryland to pay interest on the same, would be a partial guaranty by Maryland of the principal of some of the debentures, and would be in direct conflict with article VI, section, 1, of the debenture agreement, which provides as follows: "* * * Otherwise than for the payment of interest, Maryland Casualty Company shall not be liable in any manner for the obligations under the debentures, notwithstanding the corporation (Potomac) may be a wholly owned or controlled subsidiary of Maryland Casualty Company."

The learned chancellor below, in his careful and well-reasoned opinion, in order to preserve the equities between the parties pursuant to the terms of the debenture agreement, as has been noted, held that Potomac did not

have authority to contract with Maryland to pay a sum of money which it admittedly did not have at the time of making contract, in violation of the provision of article III, section 2, sub-paragraph 1, hereinbefore quoted. And the appellant questions the validity of the decree in the above respect upon the theory that it is a reformation of the contract between Maryland and Potomac. However, that contract raised in itself a doubt as to the validity of the transaction on the part of Potomac, by including a provision that the additional sum of $228,990.56 would be paid as and when such additional payment should be authorized by a court of competent jurisdiction. The chancellor did not attempt to modify that agreement, but correctly held that it was an unauthorized act of Potomac; and in order to accomplish complete equity between the parties, decreed that the debentures delivered by Maryland to Potomac under the contract, and cancelled and rescinded under the provisions of the debenture agreement, should be re-issued and authenticated by the trustee, guaranteed as to interest, and delivered to Maryland to the extent the unpaid sum represented par value of debentures. It was further decreed that Maryland should execute and deliver to Potomac a receipt for the debentures and an acknowledgment that no indebtedness is due and owing to it by Potomac by reason of the excess purchase. The decree then provided that, in case the debentures so executed, authenticated and delivered to Maryland, may be tendered in response to any future call for tenders of debentures under the provisions of the debenture agreement, then certain notice should be given to the holders of other debentures; and the court reserved jurisdiction to grant or withhold approval of any purchase proposed to be made by Potomac, for the purpose of maintaining an equality of position between the debentures held by Maryland and those in the hands of other persons, including the appellant.

We find no error in these conclusions, and the decree appealed from will be affirmed.

*Decree affirmed, with costs.*